JIM SMITH v. THE STATE.

*No. 3343. Decided December 18.*

1. **Practice—Circumstantial Evidence.**—Charge of the Court properly omits to instruct the jury on the law of circumstantial evidence when direct evidence has been adduced on the trial, and proof of confession is direct evidence.

2. **Same—Accomplice Testimony.**—A person's mere knowledge of the commission of a crime, in the absence of proof implicating him therein, does not constitute such person an accomplice; and when he testifies as a witness his testimony will not demand of the trial court a charge upon the law of accomplice testimony.

3. **Practice—New Trial—Newly Discovered Evidence.**—Controverting the motion for new trial as asked for upon the ground of newly discovered evidence, the State showed that such newly discovered testimony was unworthy of credit, and would not probably affect the result on another trial. *Held*, that the new trial was properly refused.

4. **Murder—Fact Case.**—See the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Lamar. Tried below before Hon. E. D. McClellan.

This conviction was in the first degree for the murder of Andrew Shearon, the death penalty being assessed against the appellant.

The proof shows that the deceased was the proprietor of a saloon situated on the east side of South Main Street, near the Texas & Pacific Railroad depot, in the city of Paris, the said depot being about three-quarters of a mile distant from the public square. Early on the morning of May 18, 1888, his dead body was found in bed in his room in the rear of and adjoining the saloon. His skull had been crushed with a blunt instrument of some description, but the instrument, after careful search, could not be found. The premises showed no indications of having been opened by force. The front door was closed, with the key on the inside, but the back door was open or slightly ajar. It was shown that one Newt Harris, now deceased, was discharged from employment in the said saloon a few weeks before the murder, and that his discharge engendered unfriendly feeling between him and the deceased, and that deceased had expressed fears of trouble with said Harris, and requested the city marshal to keep a watch on him. It was also shown that the defendant, who is a negro, was in a manner the body servant of Harris, and that they were often seen together immediately before and after the murder. Deceased had two partners interested with him in the saloon, one of whom was Dr. Miller, a resident of the Indian Territory.

George W. Wells testified for the State that he was general manager of the cotton compress, which was situated about five hundred feet distant from Shearon's saloon and near the railroad depot. At the time of and for two weeks after the murder of Shearon the defendant worked as one of the hands at the compress. The witness did not know where he went to at the end of the said two weeks, when the compress stopped running and the hands were discharged. Newt Harris had worked in Shearon's saloon as barkeeper, but was discharged a short time before the murder.

William Smith testified for the State, in substance, that at the time of the murder he was an officer and lived about one and a quarter miles northeast from Paris. A few days after the murder the defendant was sent into the country with a horse by Mr. Hunt. Mr. Hunt requested witness, who was going in the direction of the place to which the defendant was to take the horse, to point out the place to defendant. En route the

witness asked the defendant where he lived.   He replied that he lived near the Texas & Pacific depot.   Witness asked him if "that was not a pretty hard neighborhood?"   He replied that it was; that a bad killing had recently occurred there; that he and another colored man saw Andrew Shearon ten or fifteen minutes before he was killed, and that a large white man was present.   He refused to tell who the large white man was, but "turned it off" by saying that he was a railroad man.   Newt Harris was a very large and powerful white man.

J. R. Fletcher testified for the State that he was barkeeper at the White Elephant Saloon in Paris at the time Shearon was murdered.   Newt Harris and defendant came into that saloon early on the morning after the murder and took a drink, Harris treating.   They then went into the rear apartment of the saloon.   The witness saw them often together, before and after the killing.

Alice White was the next witness for the State.   She testified that at the time of the murder of Shearon she lived on the place of Mr. A. R. Craigo, about a mile and a quarter from the railroad depot, and she did not then know the defendant.   About a month or more after the murder she moved to the house of her mother, who lived near the said depot, and became the mistress of the defendant, with whom she lived and slept for three or four months—her mother occupying the same house.   One night, about three weeks before his arrest, the defendant awakened the witness by calling the name of Newt Harris.   He was calling Harris in his sleep.   The witness awakened him and asked him what he meant by calling Newt Harris's name.   He replied, "Damn you, shut up!   You have got too much mouth!"   Witness, however, insisted upon being told, and he finally said to witness, "Newt Harris and I killed Andrew Shearon for his money."   He would tell witness no more.   A week or two afterwards a negro named Fred Boren came to the witness near the depot hotel, and asked if she knew "Comanche Jim," the defendant's psuedonym.   Witness at first did not reply, but the negro displayed so great an anxiety to see the defendant that she finally told him where to find him.   A few minutes later she saw the defendant and Boren engaged in an apparent serious conversation.   After Boren left she asked defendant what he and Boren had to talk about so seriously.   He replied that witness had too much mouth, and then told her that they had discussed the Shearon murder, and that he would have to leave Paris as he was afraid somebody would swear a lie on him and break his neck.   The witness and defendant came to an amicable separation a short time before the arrest of the former.   Witness did not voluntarily appear against the defendant.   She was taken by an officer to the court house and was then sworn to tell the county officials what she knew.   She told them what she has testified on this trial, and was then placed in jail, as a means of

extorting more from her, but after she convinced the officials that she knew no more, she was released.

Lucinda Jones, the mother of the preceding witness, testified for the State, in substance, that she slept in the same room occupied by the defendant and her said daughter, who, though not married, lived together as husband and wife for several months after the murder. The muttering of the defendant in his sleep attracted the attention of the witness one night. He used Shearon's name in his mutterings, and witness asked him what was the matter with him. He replied, "That man Shearon is bothering me." He and Alice were both asleep. Alice did not live at or near the depot at the time of the murder.

Harrison Polk testified for the State that he went with defendant into Shearon's saloon for a glass of beer two or three days before the murder. From the saloon they went to the depot platform, and while standing there talking they observed Shearon standing in his front door. Pointing to Shearon, the defendant said, "Yonder is a damned son-of-a-bitch I am going to do up. He has not treated me right." On the morning after the murder the witness met the defendant on Clarksville Street, when the defendant said to him, "I did that damned son-of-a-bitch up last night." Witness replied, "Don't tell me about it, for if I am called upon I will tell it." Several months afterwards defendant asked witness if he had ever divulged his statement on Clarksville Street. The witness told him that he had not, and defendant said that he was going to leave Paris, as he was afraid of arrest for the murder of Shearon. The first person to whom witness related these facts was officer Polk Burris, who was engaged in working up the case. Burris told the witness to keep his knowledge to himself until he was called upon to testify in regard to it.

Tom Miller testified for the State that some time after the death of Newt Harris he had a conversation with defendant about the killing of Shearon, in the course of which the defendant said, "The man who killed Andrew Shearon is dead; you are behind the excitement."

Smith Gordon testified for the State that subsequent to the murder of Shearon he met the defendant in the Indian Nation, on which occasion the defendant told him that he was afraid to go back to Paris, as a serious charge was pending there against him. He did not tell witness what the charge was, nor did the witness hear of Shearon's murder until after he got back to Paris.

John Crow testified for the State that he was foreman of the 'Frisco yards at the time of the murder of Shearon. He went to Lapita, Indian Territory, on June 13, 1888, and on his arrival at that point met the defendant. He did not know how long the defendant had then been in Lapita. State closed.

Of the witnesses for the defense who impugned the reputation of the State's witness Alice White for truth and veracity, all save one admitted

on cross-examination that they had never heard a person say she was unworthy of belief on oath.

Sheriff Gunn testified for the State that he heard Alice White relate what she knew about the murder several different times.    She was always reluctant to talk about it, and always told the same story, conforming in every detail to her testimony on this trial.    Mr. Minor, one of the grand jurors who found the indictment against the defendant, testified that Alice White's testimony before the grand jury and on the trial was circumstantially the same.

The evidence set up in the motion for new trial as newly discovered was embodied in the affidavits of Anna Logan and J. H. Minton.    Anna Logan's affidavit sets forth that at about ten o'clock on the fatal night she saw Newt Harris and Alice White standing together on the depot platform, about fifty feet from Shearon's saloon, looking towards the said saloon; that in passing near the said parties she heard Harris say to Alice White, "It is too early, Alice, to go over there yet;" that she, affiant, was at that time sleeping in the same room near the depot, in which Alice White slept, and that on the following morning she saw the said Alice pull off a bloody dress which she threw into a corner of the room; that during the day Alice told affiant that she, Alice, had burned the "damned dress," and that a few days later Newt Harris told her, affiant, that if she ever said anything about the killing of Shearon he, Harris, would kill affiant.

Minton's affidavit sets out as follows:  "William Miller hired Newt Harris to kill Andy Shearon.    Miller gave Newt Harris the sum of fifty dollars to kill Andy Shearon for sleeping with his, Miller's, wife.    Miller carried with him to the Indian Nation the piece of iron with which Newt Harris killed Shearon.    James Smith, the defendant, had nothing to do with the killing of Andy Shearon.    Newt Harris did that killing at the request of William Miller."

The State controverted the motion for new trial, and called J. H. Minton as its first witness.    He testified, in substance, that he did not witness the murder of Andrew Shearon, and did not know who killed him.    He signed the affidavit in support of the defendant's motion for new trial, affirming that the defendant had nothing to do with the killing, and that the murder was committed by Newt Harris, because said Harris told him that he, Harris, killed Shearon, and because Dr. William Miller, of the Indian Territory, also told him that he, Miller, hired Harris to kill Shearon, paying Harris fifty dollars for doing it.    Witness went to Antlers, in the Indian Nation, on the morning that Shearon was found dead. He went on the 'Frisco passenger train, leaving Paris between 7 and 8 o'clock a. m.    On the depot platform at Antlers he saw Dr. Miller talking to a Choctaw Indian.    He, Dr. Miller, then had a piece of iron in his hand.    In witness's presence and hearing Dr. Miller said to the Choctaw

Indian, "I hired and gave Newt Harris $50 to kill Shearon. Shearon will never f——k another man's wife." Miller then walked off and hid the piece of iron under a log about 300 yards distant from the depot. He told witness that the said iron was the instrument Harris killed Shearon with, and that he gave it to Harris for that purpose. Harris afterwards told the witness that Dr. Miller gave him $50 for killing Shearon. The witness was positive that he went to Antlers on the regular 'Frisco passengers train, leaving Paris early in the morning.

To contradict this witness the State proved by two witnesses, one of them being the attorney for the 'Frisco Railroad, that no passenger trains going from Paris to Antlers had ever run over that road in the morning, but on the contrary had always left Paris for that point after six o'clock in the evening. H. B. Birmingham, the then county attorney of Lamar County, testified that subsequent to the murder of Shearon, a Mr. Frazier, upon information he received from Minton, swore out an affidavit charging Dr. Miller with complicity in the murder. Minton was brought before the witness and sworn, but he swore to nothing upon which a charge against Miller could be based. Under oath at that time, Minton said nothing whatever in regard to Miller's complicity in the murder.

The State next called Anna Logan to the stand. She testified that the facts set out in her affidavit in support of the defendant's motion for new trial were true in every particular, except that she was mistaken in stating in her affidavit that she and Alice White occupied the same room at the time of the murder. As a matter of fact, they occupied the same house near the depot, but different rooms.

To contradict the witness Anna Logan the State proved by A. R. Craigo that at the time of the murder of Shearon he lived in Paris, about a mile and a quarter north of the Texas & Pacific depot. The State's witness Alice White was then in his employ, and lived at his house, and was at his house as late as nine o'clock on the fatal night.

No brief for appellant.

*W. L. Davidson*, Assistant Attorney-General, for the State.

WILLSON, JUDGE.——On the night of May 18, 1888, Andrew Shearon was murdered in his bed, his skull having been crushed and broken in several places by blows inflicted with some blunt instrument. Jim Smith, the defendant, stands convicted of said murder, the conviction being for murder in the first degree, with the death penalty assessed.

There has been no presentation of the case in behalf of the defendant in this court, nor is there an assignment of errors in the record. In an

original and amended motion for a new trial errors are complained of which we will notice.

These are: 1. That the court failed to instruct the jury as to circumstantial evidence. This was not error, as the inculpatory evidence was not wholly circumstantial. There was proof that the defendant confessed to having committed the murder, and a confession is direct and not circumstantial evidence. It is only when the inculpatory evidence is wholly circumstantial that an instruction as to that character of evidence is demanded. Willard v. The State, 26 Texas Ct. App., 126; Heard v. The State, 24 Texas Ct. App., 103; Carr v. The State, Id., 562.

2. That the court failed to instruct the jury in relation to accomplice testimony.

This was not error, because there was no evidence demanding, or which would have warranted such an instruction. Mere knowledge on the part of a witness that the defendant committed the crime does not render such witness an accomplice so as to require corroboration of his testimony. To require or warrant an instruction on accomplice testimony, there must be some evidence of a witness's complicity in the crime for which the defendant is being tried. Pitner v. The State, 23 Texas Ct. App., 366; Kerrigan v. The State, 21 Texas Ct. App., 487; Brown v. The State, 6 Texas Ct. App., 286; Ham v. The State, 4 Texas Ct. App., 645. There was no such evidence in this case.

3. That a new trial should have been granted the defendant upon the ground of newly discovered evidence. This ground of the motion was controverted by the State, and we think successfully. It was shown that the pretended newly discovered evidence was not worthy of credit, and of a character which would not be likely to change the result on another trial. Rucker v. The State, 7 Texas Ct. App., 549.

4. That a new trial should have been granted the defendant because the verdict of the jury is contrary to the evidence. We have carefully considered the evidence, and our judgment is that the conviction is in accordance with, and fully supported by it. Defendant confessed that he committed the murder, and his confession is strongly corroborated by other facts proved.

Finding no error in the conviction it is affirmed.

*Affirmed.*

Judges all present and concurring.